[Docket No. 173.]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| BARBARA MCLAREN and VINCENT TRIPICCHIO, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE UPS STORE, INC., *et al.*,<br><br>Defendants. | Civil No. 21-14424 (RMB/MJS)<br><br>**OPINION** |

**RENÉE MARIE BUMB, Chief United States District Judge:**

This case is about overcharging for notary fees. For decades, New Jersey law set the maximum fees a notary public can charge for notary services. *See generally* N.J. Stat. Ann. § 22A:4-14. Plaintiffs Barbara McLaren and Vincent Tripicchio claim that Defendants The UPS Store, Inc. (TUPSS), RK & SP Services, LLC (RKSP), and JB & A Enterprises (JB&A) violated that law by charging them notary fees beyond what the law allows. In doing so, Plaintiffs say, Defendants violated New Jersey's consumer protection laws, like the New Jersey's Consumer Fraud Act (CFA), N.J. Stat. Ann. § 56:8-1 *et seq.*, and Truth-in-Consumer Contract, Warranty, and Notice Act (TCCWNA), N.J. Stat. Ann. § 56:12-14 *et seq.*, and unjustly enriched themselves at Plaintiffs' expense. Plaintiffs claim that for over a decade, Defendants have been overcharging consumers for notary fees in violation of New Jersey state-law. Plaintiffs bring this lawsuit for themselves and on behalf of consumers who have been overcharged for notary fees by Defendants and TUPSS' New Jersey franchisees.

Defendants move to dismiss this lawsuit, arguing, among other things, Plaintiffs have not plausibly alleged viable claims against them. That aside, TUPSS claims that as a

franchisor, it is not liable for its franchisees' alleged wrongful conduct since Plaintiffs have not shown the required day-to-day control to impose vicarious liability on TUPSS. Defendants also ask this Court to strike the class allegations from Plaintiffs' complaint.

## I.  BACKGROUND[1]

### A.  TUPSS' Business Operations and Notary Services[2]

TUPSS operates its business throughout the country through a "network" of stores owned and operated by its franchisees.  [Consol. Class Action Compl. (CAC) ¶ 52 (Docket No. 158).]  TUPSS requires its New Jersey franchisees to execute a Franchise Agreement and follow TUPSS "Operations Manual[.]"  [*Id.* ¶ 66.]  The Franchise Agreement requires "strict adherence to the Standards and Specifications set forth in the Manual" or in "other written directives."  [*Id.* ¶ 78.]  It also requires franchisees to comply with "[a]ll applicable laws" that includes, among other laws, federal, state, and local statutes, rules, regulations, ordinances, and so on.  [*Id.* ¶¶ 82-83.]

TUPSS requires its franchisees to offer notary services, and even mandates how many notaries must be staffed during operation hours and how many hours the notary must be available to provide notary services.  [*Id.* ¶¶ 73, 84.]  TUPSS also requires its franchisees to

---

[1] The Court takes the following allegations from the Consolidated Amended Complaint (CAC), as well as the documents referenced in the pleading and matters of public record.  The Court accepts the factual allegations as true and views them in Plaintiffs' favor.  *McTernan v. City of York, Penn.*, 577 F.3d 521, 526 (3d Cir. 2009).  The Court will "disregard labels, conclusions, and 'formulaic recitation[s] of the elements[]'" of the cause of action. *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 265 (3d Cir. 2021) (first alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[2] The CAC is vast; it is over a hundred pages long and annexes exhibits totaling over a thousand pages.  Plaintiffs have gone to great lengths to describe the minute details of TUPSS' business practices.  It also contains many allegations about other lawsuits involving TUPSS in other states which is unnecessary.  Plaintiffs have thrown in "everything but the kitchen sink" in the CAC.  Yet Plaintiffs offer only a few allegations on the challenged transactions that form the basis of their claims.  It has been laborious for this Court to wade through the CAC's allegations to ascertain whether Plaintiffs have plausibly stated a claim.  The Plaintiffs are warned that any further pleadings that can be fairly characterized as "throwing in the kitchen sink" will result in a striking of the papers.

use "a required network-wide [point-of-sale] system with uniform TUPSS-created-and-approved SKU codes[.]" [*Id.* ¶ 99.]   TUPSS closely monitors its New Jersey franchisees' operations, tracking, among other things, "the number, dates, and types of notary transactions engaged in by each Store . . . and the amount of money generated from these transactions" and what the franchisee "charged for each notary transaction." [*Id.* ¶ 99.]

TUPSS also provides extensive training for its franchisees on notary services and notary pricing.  [*Id.* ¶ 205.]  This training covers the "notary services business" and how to "properly conduct[] notary services transactions."  [*Id.* ¶ 207.]  TUPSS has also created a "Profit Action Committee" (PACE) "to help franchisees recognize opportunities that may increase profitability."  [*Id.* ¶ 210.]  TUPSS and PACE provide franchisees with training materials aimed "to influence pricing structures and decisions with respect to notary services[.]"  [*Id.* ¶ 212.]  TUPSS and PACE also circulate newsletters to franchisees on notary services, and in one publication, PACE recommends "96% profit margins for notary services[.]" [*Id.* ¶ 235.] TUPSS issued that publication "to facilitate the efficient consideration and implementation of pricing decisions by TUPSS franchisees."  [*Id.* ¶ 234.] And TUPSS' Operations Manual mandates that franchisees "'must' consider 'margin on Notary Services' in determining 'when and how aggressively to market such services."  [*Id.* ¶ 213.]  TUPSS' training materials also provide specific instructions to franchisees on "pricing for [the Store's] notary services."  [*Id.* ¶ 213.]   Some of TUPSS' training materials provide exercises on conducting multiple-product transactions that include notary services, which may include services that qualify for an add-on "clerical fee" like copying or faxing.  [*Id.* ¶ 225.]

On top of TUPSS' extensive training program on notary transactions, TUPSS controls how its New Jersey franchisees market notary services.  [*Id.* ¶¶ 141, 143.]   The Franchise

Agreement requires franchisees "to follow all advertising and marketing Standards and Specifications established [by TUPSS] . . . . [and] use, sell or distribute only those advertising or marketing materials that are authorized by TUPSS in writing prior to use." [*Id.* ¶ 142.] TUPSS and New Jersey franchisees collectively market notary services with advertisements saying, among other things, "When you notarize with us, we'll help you print any necessary copies at no extra cost." [*Id.* ¶¶ 166-68.]

TUPSS also maintains a national customer service department that handles, among other things, customer complaints about TUPSS' franchisees' notary services and prices. [*Id.* ¶¶ 185-86.] Some customers complain about franchisees overcharging for notary fees in violation of the law. [*Id.*] In some cases, TUPSS has directly addressed customer complaints by issuing a refund to the customer without insisting the customer seek a refund from the franchisee. [*Id.* ¶¶ 187, 194-95.] TUPSS also advises its franchisees about state laws and regulations on notary fees. [*Id.* ¶ 187.] For example, TUPSS issued a Franchise Disclosure Document to its franchisees, including its New Jersey's franchisees, instructing them that they "'must offer notary services' and that in states that 'regulate the maximum amount you may charge for notary services . . . You must comply with these laws.'" [*Id.* ¶ 84 (omission in original, emphasis removed).] It also issued a bulletin to its franchisees entitled, "Best Practice Ideas" for "Notary Fees/Services: Reminders to ensure compliance with all applicable laws" in which TUPSS advised its franchisees that "notary services and fees may be regulated by state, local, or other applicable laws and regulations." [*Id.* ¶ 242.] TUPSS requires its franchisees to comply with notary pricing laws. [*Id.* ¶ 92.] And under the Franchisee Agreement, TUPSS can terminate a franchisee for, among other things,

4

"over-charging customers or charging customers for products or services they did not request or want, or otherwise acting deceptively." [*Id.*]

Notary services are a profitable aspect of TUPSS' business. [*Id.* ¶ 216.] TUPSS takes a five-percent royalty fee from its New Jersey franchisees' store-generated revenues, which include "notary-services-related revenue." [*Id.* ¶ 56.] According to Plaintiffs, TUPSS takes a combined 8.5% of all notary services revenue from each of its New Jersey Stores as royalties and marketing/advertising fees." [*Id.* ¶ 3.]

### B. TUPSS' Franchisees Overcharge Plaintiffs for Notary Fees

For decades, New Jersey law controlled how much notaries public could charge for notary services, depending on the document to be notarized. 1953 N.J. Laws, ch. 22, § 48 (codified at N.J. Stat. Ann. § 22A:4-14). Since 2002, New Jersey law capped notary fees at $2.50 for "administering an oath or taking an affidavit . . . taking proof of a deed" and "taking all acknowledgments[.]" 2002 N.J. Laws, ch. 34, § 48; N.J. Admin. Code § 17:50-1.18(a).[3]

In August 2019, Plaintiff Barbara McLaren went to a TUPSS franchise then operated by Defendant RK & SP Services, LLC (RKSP) to have two signatures acknowledged by a notary.[4] [CAC ¶¶ 259, 264.] Under New Jersey law, RKSP could only charge McLaren $2.50 for each acknowledgment. 2002 N.J. Laws, ch. 34, § 48. Yet McLaren paid ten dollars in notary fees; five dollars more than she should have paid. [CAC ¶ 266.]

---

[3] In 2021, New Jersey Legislature passed the "New Jersey Law on Notarial Acts" amending several laws, including the fees notaries public may charge. 2021 N.J. Laws, ch. 179 (effective Oct. 20, 2021). The Legislature removed the fee schedule in the statute, and authorized the State Treasurer to set the fee "by regulation." N.J. Stat. Ann. § 22A:4-14.

[4] At that time, RKSP was in the process of selling its assets and transferring its TUPSS franchise to Defendant Hamilton Pack N Ship LLC (Pack N Ship). [CAC ¶¶ 258-61.] Plaintiffs seek to hold Pack N Ship liable under successor liability principles. [*Id.* ¶¶ 262-63.] This Court previously denied Pack N Ship's summary judgment motion on successor liability. *McLaren v. UPS Store, Inc.*, 2025 WL 2938269 (D.N.J. Oct. 16, 2025).

And in October 2020, Plaintiff Vincent Tripicchio went to a TUPSS franchise operated by Defendant JB & A Enterprises (JB&A) to have a power of attorney notarized. [*Id.* ¶ 253.] New Jersey law capped the notary fee for that service at $2.50. 2002 N.J. Laws, ch. 34, § 48. Yet Tripicchio paid $15.00; $2.50 for a "Notary" fee and $12.50 for a "Notary Convenience" Fee. [CAC ¶ 254 & n. 181.] JB&A did nothing besides notarize the document. [*Id.* ¶¶ 255-56.]

### C. The Lawsuits

McLaren and Tripicchio each filed a putative class action in New Jersey state court against TUPSS and the TUPSS franchise that overcharged them, claiming Defendants, among other things, violated N.J. Stat. Ann. § 22A:4-14 by overcharging notary fees. [*Id.* ¶ 47; *see also* Notice of Removal ¶ 3 (Docket No. 1) (*McLaren* Action); *Tripicchio v. The UPS Store, Inc. et al.*, No. 3:21-cv-14512, Notice of Removal ¶ 3 (Docket No. 1) (*Tripicchio* Action).] They each brought, among other claims, a New Jersey Consumer Fraud Act (CFA), N.J. Stat. Ann. § 56:8-1, *et seq.* claim. [*McLaren* Action (Docket Nos. 1, 1-3); *Tripicchio* Action (Docket Nos. 1, 1-3)).] From there, these lawsuits have taken a long and winding road to get here, with trips from state court to this Court to the Third Circuit, and back again. The Court briefly recounts the relevant procedural history.

Before this Court's involvement, McLaren's lawsuit went before New Jersey's Appellate Division where the appellate court had to decide whether N.J. Stat. Ann. § 22A:4-14: (1) imposes the maximum fee that notaries public can charge; and (2) provides for a private cause of action for violations of the statute. *McLaren v. UPS Store, Inc.*, 2021 WL 3085151 (N.J. Super. Ct. App. Div. July 22, 2021). The Appellate Division answered yes to the first question, but no to the second. *Id.* at *6, *8. In doing so, the Appellate Division

declined to address whether a violation of N.J. Stat. Ann. § 22A:4-14 alone could support a CFA claim. *Id.* at *8 ("It has become clear that the paucity of the existing record impedes any consideration of whether charging a fee that violates [N.J. Stat. Ann. § 22A:4-14] is alone sufficient to sustain the CFA count in the complaint.").

After the appellate court ruled, Defendants removed the lawsuits to this Court. [*McLaren* Action, Docket No. 1; *Tripicchio* Action, Docket No. 1.] Before these lawsuits were consolidated, TUPSS and JB&A moved to dismiss the *Tripicchio* Action. *Tripicchio v. UPS Store, Inc.*, 2023 WL 3182915 (D.N.J. Apr. 30, 2023). The Court granted that motion, in part, and denied it, in part. *Id.* at *11. The Court ruled that Tripicchio plausibly stated a CFA claim and Truth-in-Consumer Contract, Warranty, and Notice Act (TCCWNA), N.J. Stat. Ann. § 56:12-14 *et seq.* claim. *Id.* at *6-8.

For Tripicchio's CFA claim, the Court rejected TUPSS' and JB&A's argument that a mere violation of N.J. Stat. Ann. § 22A:4-14 could not support a CFA claim. *Id.* at *7. The Court reasoned that TUPSS and JB&A were "engaged in the commercial sale and marketing of notary services to the public" and Tripicchio had alleged that they overcharged the public notary fees in violation of N.J. Stat. Ann. § 22A:4-14. *Id.* Those allegations, the Court explained, support a CFA claim. *Id.* Turning to the TCCWNA claim, the Court found Tripicchio alleged enough facts to support that claim, reasoning Tripicchio was a consumer, TUPSS and JB&A were commercial sellers who "offer notary services for fees evidenced in writing[,]" and TUPSS and JB&A violated N.J. Stat. Ann. § 22A:4-14 by overcharging for notary fees. *Id.* The Court added that a violation of the CFA could also support a TCCWNA claim. *Id.*

The Court, however, dismissed Tripicchio's state-law claims for, among other things, unjust enrichment. *Id.* at *9. The Court explained that "New Jersey law does not recognize unjust enrichment as an independent tort cause of action." *Id.* (citation and internal quotation marks omitted). The Court also reasoned that Tripicchio's "payment was part of a transaction in which [TUPSS and JB&A] provided a service at an agreed upon price—that is, each party received their expected benefit." *Id.* And for this reason, the "voluntary payment rule" barred Tripicchio's unjust enrichment claim because Tripicchio willingly paid the fee for services rendered. *Id.*

Following that decision, the Court ordered these lawsuits consolidated. *McLaren v. UPS Store, Inc.*, 2023 WL 11960423, at *1 (D.N.J. Oct. 10, 2023). Plaintiffs filed the CAC, asserting CFA and TCCWNA claims, as well as New Jersey state-law unjust enrichment and civil conspiracy claims. [*See generally* CAC.] They also seek declaratory relief. [*Id.*] Plaintiffs bring their claims for themselves and on behalf of individuals who paid Defendants fees for notary services in New Jersey more than the fees allowed by N.J. Stat. Ann. § 22A:4-14. [*Id.* ¶ 269.]

### D. Defendants' Motion to Dismiss and Motion to Strike

Defendants move to dismiss Plaintiffs' claims, or in the alternative, to strike the CAC's class allegations. [Defs.' Mem. of Law in Supp. of Mot. to Dismiss 1-20 (Defs.' Br.) (Docket No. 173-1).] Defendants argue Plaintiffs have not stated plausible claims. [*Id.* at 4-10.] And even if Plaintiffs did, TUPSS argues that as a franchisor, it is not liable to Plaintiffs for its franchisees' alleged wrongful conduct. [*Id.* at 10-18.]

For Plaintiffs' CFA claim, Defendants contend Plaintiffs have not satisfied Federal Rule of Civil Procedure 9(b)'s pleading standard because they offer no allegation on what was

said to Plaintiffs during their transactions. [*Id.* at 6.] They explain Plaintiffs identify no statement that was misleading. [*Id.*] Likewise, Defendants argue Plaintiffs have not pled an actionable omission. [*Id.*] They assert Plaintiffs have not alleged who concealed a material fact from them during their transactions. [*Id.* at 6-7.] At any rate, Defendants argue they did not mislead Plaintiffs because Defendants disclosed the fees to Plaintiffs before the transactions. [*Id.* at 7.]

Turning to Plaintiffs' TCCWNA claim, Defendants assert that Plaintiffs only make vague and conclusory allegations to support that claim. [*Id.* at 8-9.] They offer no allegations on seeing a sign or notice about notary fees. [*Id.*] On top of that deficiency, Defendants argue that the fees set by N.J. Stat. Ann. § 22A:4-14 did not create a "clearly established legal right" at the time Plaintiffs had their documents notarized. [*Id.* at 9-10.] Defendants add that New Jersey's Appellate Division never ruled that N.J. Stat. Ann. § 22A:4-14 bars a company that provides notary services from charging a convenience fee on top of a notary fee. [*Id.* at 10 (citing *McLaren*, 2021 WL 3085151, at *6 n.7).]

Onto Plaintiffs' unjust enrichment claim, Defendants argue that claim still fails for the reasons the Court found earlier. [*Id.* at 10.] They explain unjust enrichment is not a standalone tort action under New Jersey law. [*Id.*] Defendants also argue they were not unjustly enriched because Defendants performed a service at an agreed-on price. [*Id.*]

In any event, TUPSS contends that it is not liable to Plaintiffs. [*Id.* at 10-15.] TUPSS argues that under New Jersey law, TUPSS as a franchisor is not liable for its franchisees' wrongful conduct. [*Id.* at 11.] Pointing to *Boutahli v. 7-Eleven, Inc.*, 2020 WL 3287127 (D.N.J. June 18, 2020), TUPSS asserts that Plaintiffs offer no allegation that TUPSS exercises day-to-day control over its franchisees to trigger vicarious liability. [*Id.* at 11-12.] TUPSS

explains that the franchise agreement shows that TUPSS lacks the required control over its franchisees.  [*Id.* at 12.]  TUPSS adds that Plaintiffs have abandoned their claim that TUPSS controls notary pricing for its franchisees.  [*Id.* at 15.]  Without the required day-to-day control, TUPSS contends it is not vicariously liable for its franchisees' conduct.  [*Id.* at 12-15.]

And TUPSS argues Plaintiffs cannot hold it liable for the notary fee overcharges based on a conspiracy.  [*Id.* at 16-18.]  TUPSS asserts that civil conspiracy is not a standalone claim; it requires proof of an underlying wrong.  [*Id.* at 16.]  Since Plaintiffs' other claims fail, the argument goes, their civil conspiracy claim fails too.  [*Id.*]  That aside, TUPSS contends that Plaintiffs offer no allegation that TUPSS conspired with its franchisees to overcharge notary fees.  [*Id.* at 17-18.]  It argues Plaintiffs only offer speculation on whether TUPSS knew, or should have known, that its franchisees were overcharging notary fees or that N.J. Stat. Ann. § 22A:4-14 capped the amount on notary fees.  [*Id.* at 17.]  TUPSS adds that Plaintiffs identify no employee at TUPSS who allegedly joined this so-called conspiracy to overcharge notary fees.  [*Id.* at 18.]

Lastly, Defendants move to strike the class allegations from the CAC.  [*Id.* at 18-20.] They argue Plaintiffs cannot certify a class action because:  (1) Plaintiffs cannot represent a class of consumers who did not transact with RKSP or JB&A because consumers who did not transact with those franchisees have no claim against them; and (2) individual issues will predominate on Plaintiffs' CFA and TCCWNA, such as what was said to consumers, what signs consumers saw, and so on.  [*Id.* at 20.]

Plaintiffs resist dismissal, arguing they have plausibly stated their claims, and TUPSS can be held liable for the overcharges.  [Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss

1-3 (Pls.' Opp'n Br.) (Docket No. 178).] Plaintiffs claim Defendants either take swipes at the CAC's allegations or ignore them altogether. [*Id.*]

For their CFA claim, Plaintiffs first argue this Court should sustain the claim based on the Court's earlier ruling in the *Tripicchio* Action. [*Id.* at 7-9.] According to Plaintiffs, the Court's earlier ruling is law-of-the-case, and should not be revisited because the Court either considered the very same arguments that Defendants make here and rejected them, or Defendants waived their arguments by not raising them earlier. [*Id.* at 8-9.]

That aside, Plaintiffs argue they have stated a plausible CFA claim. [*Id.* at 9-10.] Plaintiffs contend that the CFA punishes "unconscionable commercial practices" and a violation of a regulation or law (even if not enacted under the CFA) can be an "unconscionable commercial practice." [*Id.*] Plaintiffs argue that violations of those laws or regulations do not require a showing of intent. [*Id.*] According to Plaintiffs, Defendants engaged in an unconscionable commercial practice when they overcharged for notary fees in violation of N.J. Stat. Ann. § 22A:4-14. [*Id.*] Plaintiffs also argue that notary publics are different from normal retailers since their power flows from the State and they perform a public service. [*Id.* at 11.] So the burden is on the notaries to comply with the law and not overcharge for their services. [*Id.* (citing *Seplow v. Closing Pro, Inc.*, 717 F. Supp. 3d 427 (E.D. Pa. 2024)). And Plaintiffs contend that the CAC contains many allegations showing that Plaintiffs and class members were misled and charged fees for notary services that Defendants by law could not charge. [*Id.* at 12.]

Turning to their TCCWNA claim, Plaintiffs again argue the law-of-the-case doctrine bars Defendants' request to have that claim dismissed. [*Id.* at 13.] Plaintiffs explain that the Court sustained their TCCWNA claim, rejecting similar arguments that Defendants press

here.  [*Id.*]  Law-of-the-case doctrine aside, Plaintiffs argue that Defendants violated a clearly established legal right of consumers by overcharging for notary fees in violation of N.J. Stat. Ann. § 22A:4-14.  [*Id.* at 14.]

For their unjust enrichment claim, Plaintiffs argue the Court incorrectly dismissed that claim in the *Tripicchio* Action.  [*Id.* at 15-16.]  According to Plaintiffs, the Court failed to recognize that an unjust enrichment claim can "arise outside the usual quasi-contractual setting."  [*Id.* at 15 (quoting *Goldsmith v. Camden Cnty. Surrogate's Off.*, 975 A.2d 459, 463 (N.J. Super. Ct. App. Div. 2009)).  Plaintiffs argue New Jersey courts have recognized unjust enrichment claims where a party pays for a service above what the law allows to be charged even if the payment is made willingly.  *Id.* (citing *Jenkins v. Kaplan*, 148 A.2d 33 (N.J. Super. Ct. App. Div. 1959)).  Because Defendants charged fees more than N.J. Stat. Ann. § 22A:4-14 allows, Plaintiffs say, Defendants have been unjustly enriched at Plaintiffs' expense.  [*Id.* at 16.]

And Plaintiffs assert the voluntary payment rule does not bar their unjust enrichment claim since Plaintiffs were unaware of N.J. Stat. Ann. § 22A:4-14's cap on notary fees.  [*Id.*]  At any rate, Plaintiffs assert that courts should not apply the voluntary payment rule on a motion to dismiss where, as here, the complaint does not show that the payment was "truly voluntary and without mistake of fact."  [*Id.* (quoting *Rickenbach v. Wells Fargo Bank, N.A.*, 635 F. Supp. 2d 389, 395 (D.N.J. 2009)).

Turning to TUPSS, Plaintiffs argue it is vicariously liable for RKSP's and JB&A's conduct based on agency principles.  [*Id.* at 3-7.]  Plaintiffs argue that under New Jersey law, a franchisor is vicariously liable for its franchisee's conduct if "the franchisor is able to exercise control over the day-to-day operations of the franchise."  [*Id.* at 4 (quoting *eTeam, Inc v. Hilton*

*Worldwide Holdings, Inc.*, 2017 WL 2539395, at *2 (D.N.J. June 12, 2017)).  Plaintiffs contend the CAC provides ample detail showing TUPSS' control over its franchisees' day-to-day operations on notary fees.  [*Id.* at 5.]

For example, Plaintiffs point out that TUPSS requires every franchise to offer notary services for sale and mandates the number of hours and the time notaries must be available at stores to work.   [*Id.*]   They add that TUPSS provides specific training and makes recommendations on notary services, helps franchisees promote and market notary services, and even takes a percentage of all notary revenue.  [*Id.*]  Plaintiffs also assert that TUPSS directly involves itself in customer disputes over notary fees by providing customer service and, in some cases, even issues refunds for overcharges.  [*Id.*]  What's more, Plaintiffs argue that TUPSS extensively audits its franchisees' operations, including money earned on notary fees, and knows how much money its New Jersey's franchisees take in from notary fees.  [*Id.*]  So TUPSS knows about the overcharges.  [*Id.*]  In addition, based on TUPSS' franchise agreement, Plaintiffs contend that TUPSS had the right to terminate a franchisee for overcharging customers.  [*Id.* at 7.]  Rather than exercising that over its New Jersey franchisees who overcharged customers, TUPSS opted to require its New Jersey franchisees to impose arbitration clauses and class action waivers on TUPSS' customers obtaining notary services.  [*Id.*]  Thus, Plaintiffs argue that TUPSS exercises the required control to be held vicariously liable for its franchisees' wrongful conduct.  [*Id.*]

Onto their civil conspiracy claim, Plaintiffs contend their substantive claims are viable and as such, the derivative civil conspiracy claim cannot be dismissed for failing to show an underlying wrong.  [*Id.* at 17.]  To the merits, Plaintiffs argue the required agreement for a civil conspiracy need not be proven directly since direct evidence is unlikely available; instead,

parties can resort to circumstantial evidence. [*Id.* at 17-18.] And Plaintiffs contend the CAC outlines a conspiracy based on the allegations that TUPSS and its network stores in New Jersey—for decades—have overcharged for notary fees, TUPSS knew about the overcharges, but did nothing, with the goal to increase Defendants' and TUPSS' New Jersey franchisees' profits. [*Id.* at 19.] Plaintiffs argue thus that it is premature to dismiss the civil conspiracy claim. [*Id.* at 20.]

Lastly, Plaintiffs argue Defendants' motion to strike the CAC's class allegations is meritless and should be denied. [*Id.]* They contend courts rarely grant motions to strike class allegations, and this case is not a rare case where the complaint itself shows a class action cannot be certified. [*Id.*]

## II. DISCUSSION

### A. Plaintiffs have plausibly stated a CFA claim.[5]

The CFA "was 'designed to combat sharp practices and dealings that victimized consumers by luring them into purchases through fraudulent or deceptive means.'" *Migliore v. Vision Solar LLC*, ___ F.4th ___, ____, 2025 WL 2970755, at *3 (3d Cir. Oct. 22, 2025) (quoting *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 461 (N.J. 1994)). It outlaws "the use of 'unconscionable or abusive' commercial practices, as well as 'deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely' thereon." *Robey v. SPARC Grp. LLC*, 311 A.3d

---

[5] While Plaintiffs argue that the law-of-the-case doctrine bars Defendants from relitigating their challenges to Plaintiffs' CFA and TCCWNA claims given the Court's ruling in the *Tripicchio* Action, Pls.' Opp'n Br. at 8-9, 13, the Court finds applying the doctrine here inappropriate. *See Brennan v. William Paterson Coll.*, 34 F. Supp. 3d 416, 427-28 (D.N.J. 2014) (refusing to apply law-of-the-case doctrine to bar claims dismissed by another judge where plaintiffs offered new allegations not previously considered). Plaintiffs are the ones who brought in the "kitchen sink," and the CAC joins a new plaintiff and contains a host of new allegations and theories that were not presented in the *Tripicchio* Action. Thus, the Court will review Defendants' challenges anew.

463, 471 (N.J. 2024) (quoting N.J. Stat. Ann. § 56:8-2). "To fully advance the [CFA's] remedial purposes, courts construe its provisions broadly and liberally in favor of consumers." *Heyert v. Taddese*, 70 A.3d 680, 694 (N.J. Super. Ct. App. Div. 2013).

To prevail on their CFA claim, Plaintiffs must show: (1) Defendants engaged in "unlawful conduct[;]" (2) Plaintiffs suffered "an ascertainable loss[;]" and (3) there's a "causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (N.J. 2009). "CFA claims . . . are essentially . . . fraud claims[,]" *Robey*, 311 A.3d at 471 (omissions and alterations in original, citation and internal quotation marks omitted), and as such, Federal Rule of Civil Procedure Rule 9(b)'s particularity standard applies, *Migliore,* ___ F.4th at ___, 2025 WL 2970755, at *3. Rule 9(b) requires plaintiffs to plead "the date, time, and place of the fraud or otherwise inject[] precision or some measure of substantiation into the allegations." *MZL Cap. Holdings, Inc. v. TD Bank, N.A.*, 2016 WL 4163827, at *4 (D.N.J. Aug. 5, 2016) (citation and internal quotation marks omitted), *aff'd*, 734 F. App'x 101 (3d Cir. 2018). Simply stated, "Rule 9(b) 'requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Id.* (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999)).

Defendants focus their challenge to Plaintiffs' CFA claim on the "unlawful conduct" element. [Defs.' Br. at 6-7.] Prohibited unlawful conduct under the CFA falls into three camps: "affirmative acts, knowing omissions, and regulation violations[]"—that is, regulations the New Jersey Attorney General promulgates under the CFA. *Cox*, 647 A.2d at 462. Affirmative acts and regulation violations do not require a showing of intent, while

15

knowing omissions do. *Id.* "A practice can be unlawful even if no person was in fact misled or deceived thereby." *Id.*

New Jersey courts have recognized that violations of statutes or regulations—even regulations not enacted by the Attorney General—"can serve as evidence of unconscionable practices" to trigger CFA liability. *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 674 A.2d 582, 588 (N.J. Super. Ct. App. Div. 1996) (reversing dismissal of CFA claim, ruling that "violations of the regulations promulgated under the Consumer Loan Act can be used to prove fraudulent and unconscionable conduct prohibited by the Consumer Fraud Act"), *aff'd*, 696 A.2d 546 (N.J. 1997); *see also Francis E. Parker Mem'l Home, Inc. v. Georgia-Pac. LLC*, 945 F. Supp. 2d 543, 563 (D.N.J. 2013) (collecting cases). In those cases, courts have found a statutory or regulatory violation "could have reflected an actionable, unconscionable commercial practice" because there was a "direct and unfair compulsion of consumer acquiescence in a manner that a regulation specifically prohibited." *Nickerson v. Quaker Grp.*, 2008 WL 2600720, at *15 (N.J. Super. Ct. App. Div. July 3, 2008) (collecting cases).

For instance, in *Heyert*, New Jersey's Appellate Division held that landlords "violated the CFA as a matter of law" by charging tenants more for rent than allowed by a municipal rent control ordinance. 70 A.3d at 696-97. There, the landlords rented out apartment units in a multi-family home. *Id.* at 690. The landlords knew that the property was subject to a municipal rent control ordinance. *Id.* Even so, the landlords charged the tenants rent beyond what the ordinance allowed. *Id.* at 690-91. In affirming judgment in the tenants' favor on their CFA claim, New Jersey's Appellate Division found the landlords had engaged in unlawful conduct prohibited by the CFA. *Id.* at 695-96. The *Heyert* court explained that "the landlords charged rent in excess of that allowed by the City's rent control ordinance[,]" and

16

that "the affirmative act of overcharging rent subjected the landlords to liability under the CFA." *Id.* at 696.

To start, Plaintiffs have satisfied Rule 9(b)'s particularity requirements.  They have alleged the deceptive conduct at issue—charging consumers more for notary fees than allowed by N.J. Stat. Ann. § 22A:4-14, when that occurred (August 2019 for McLaren's transaction and October 2020 for Tripicchio's transaction), who did it (RKSP and JB&A), and where it occurred (the TUPSS franchises operated by RKSP and JB&A).  [CAC ¶¶ 253-56, 264-66.]  And Plaintiffs have submitted receipts for those transactions as proof of the overcharges.  [*Id.* ¶¶ 254, 266 Exs. GGG, III.]  Plaintiffs have pled enough information to "place [Defendants] on notice of the precise misconduct with which [they are] charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)  (brackets in original, citation and internal quotation marks omitted).  That is all that Rule 9(b) requires. *United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 176-77 (3d Cir. 2019).

Turning to the merits, Plaintiffs have plausibly alleged that Defendants have engaged in unlawful conduct since overcharging for notary fees in violation of N.J. Stat. Ann. § 22A:4-14 can be "evidence of [an] unconscionable practice[]" that the CFA outlaws. *See Lemelledo*, 674 A.2d at 588; *see also Heyert*, 70 A.3d at 696-97.  Notaries are different from ordinary retailers.  "The notary holds a public office [and] exercises a power he receives from government rather that from someone who happens to be his private employer." *Com. Union Ins. Co. of New York v. Burt Thomas-Aitken Const. Co.*, 230 A.2d 498, 499 (N.J. 1967).  Indeed, "[a] notary is a public officer and owes a duty to the public to discharge his or her functions with diligence." *Villanueva v. Brown*, 103 F.3d 1128, 1137 (3d Cir. 1997) (citing *Immerman v. Ostertag,* 199 A.2d 869, 872-73 (N.J. Super. Ct. Law Div. 1964)).  And as New Jersey's

Appellate Division in *McLaren* explained when holding N.J. Stat. Ann. § 22A:4-14 caps the fees that notaries can charge, N.J. Stat. Ann. § 22A:4-14 "provides a decidedly public benefit by limiting the amount of money the public may be charged by a public officer[.]" 2021 WL 3085151, at *3.

At some point in life, a person may need the services of a notary because the law will require it. A young couple looking to buy their first home may need a notary to acknowledge their signatures to close out the transaction and record various real estate documents. That same couple down the road may want to create a will to dispose of their assets at death and may need a notary in that process. N.J. Stat. Ann. §§ 3B:3-2, 3B:3-4. They may also want to create a power of attorney in case one becomes incapacitated and may need a notary to take an acknowledgment. N.J. Stat. Ann. § 46:2B-8.9. The list goes on. Because the law sometimes requires a person to use a notary (or other public official authorized to take acknowledgments, N.J. Stat. Ann. § 46:14-6.1), the public "would hardly expect" that notaries could charge whatever they wanted for fees, especially when the fees are set by law. *Cf. McLaren,* 2021 WL 3085151, at *3.

At bottom, Defendants employ notaries and offer notary services to the public. [CAC ¶¶ 73, 253-54, 264-66.] As New Jersey's Appellate Division noted, TUPSS and its franchisees "are providing a service to the public." 2021 WL 3085151, at *8. Defendants even try to entice consumers to use them for the consumers' notary needs with advertisements saying, "When you notarize with us, we'll help you print any necessary copies at no extra cost." [CAC ¶ 166.] And TUPSS takes a five-percent royalty fee from its franchisees' store-generated revenue, which includes "notary services-related revenue." [*Id.* ¶ 56; *see also id.* ¶ 3 ("TUPSS takes a combined 8.5% of all notary services revenue from each of its New Jersey Stores as

royalties and marketing/advertising fees.").]    TUPSS also extensively monitors its New Jersey's franchisee notary transactions, and the revenue being earned from notary fees.  [*Id.* ¶¶ 115-19.]

What's more, Plaintiffs have alleged enough facts to infer that TUPSS knows that New Jersey law caps notary fees.  Indeed, TUPSS has notified its franchisees that states may cap notary fees by law.  [*Id.* ¶¶ 84, 242.]  In fact, for its franchisees in certain States, TUPSS instructs those franchisees "to exclude from royalties all revenue received for providing" notary services since those States restrict sharing notary payments to non-notaries.  [*Id.* ¶ 90.] Viewing those allegations in Plaintiffs' favor, coupled with TUPSS' alleged extensive monitoring of its franchisees' notary transactions, there is enough at this stage to aver that TUPSS knew or should have known its franchisees are charging more for notary services than allowed by N.J. Stat. Ann. § 22A:4-14.

Like the landlords in *Heyert* who violated the CFA for charging more for rent than allowed by law, Defendants' "affirmative act of overcharging" for notary fees in violation of N.J. Stat. Ann. § 22A:4-14 is unlawful conduct that the CFA prohibits.  *See Heyert,* 70 A.3d at 696-97.  So Plaintiffs have plausibly alleged that Defendants have engaged in unlawful conduct within the CFA's meaning.  In fact, three separate federal courts in Pennsylvania have refused to dismiss statutory consumer protection act claims based on allegations that companies employing notaries charged more for notary fees than allowed by state-law. *Jaraczewski v. Equity Nat'l Title & Closing Servs.*, 2024 WL 3861248, at *5-6 (W.D. Pa. Aug. 19, 2024); *Ortiz v. Keystone Premier Settlement Servs., LLC*, 2024 WL 3522036, at *9-10 (M.D. Pa. July 23, 2024); *Seplow*, 717 F. Supp. 3d at 435-36.

19

To be clear, this Court is not ruling that an individual notary who charges a fee beyond what N.J. Stat. Ann. § 22A:4-14 allows may be liable under the CFA. Nor is the Court ruling that a mere violation of N.J. Stat. Ann. § 22A:4-14 is a per se violation of the CFA. This Court only narrowly rules that, after viewing Plaintiffs' allegations in their favor and giving them the benefit of all reasonable inferences, Plaintiffs have plausibly stated a CFA claim against Defendants. Thus, Defendants' motion to dismiss Plaintiffs' CFA claim is denied.

**B. Plaintiffs have failed to state a TCCWNA claim.**

The TCCWNA's aim "is to prevent deceptive practices in consumer contracts." *Dugan v. TGI Fridays, Inc.*, 171 A.3d 620, 646 (N.J. 2017) (citation omitted). While it does not confer new legal rights, TCCWNA requires "sellers to acknowledge clearly established consumer rights, and to provide remedies for posting or inserting provisions [in writings] contrary to law." *Spade v. Select Comfort Corp.*, 181 A.3d 969, 976 (N.J. 2018) (cleaned up, citation and internal quotation marks omitted). To prevail on their TCCWNA claim, Plaintiffs must show: (1) Defendants are "seller[s] (2) who, in writing, entered into a consumer contract or gave or displayed a consumer warranty, notice, or sign (3) containing a provision that violates a consumer's 'clearly established legal right,' (4) and [P]laintiffs are consumers who were thereby 'aggrieved.'" *Robey*, 311 A.3d at 476 (first citing *Pisack v. B & C Towing, Inc.*, 222 A.3d 693, 704 (N.J. 2020), and then citing N.J. Stat. Ann. §§ 56:12-15, -17).

A writing—whether it be a contract, notice, or sign—is a necessary element for a TCCWNA claim. *Dugan*, 171 A.3d at 648 ("By its very terms, the TCCWNA addresses 'contract[s],' 'warrant[ies],' 'notice[s],' and 'sign[s]' and does not apply when a defendant fails to provide the consumer with a required writing." (alterations in original) (quoting N.J. Stat. Ann. § 56:12-15)). Under the TCCWNA, a notice means a "written or printed

20

announcement." *Shelton v. Restaurant.com, Inc.*, 70 A.3d 544, 558 (N.J. 2013); *see also Barile v. GF-Passaic Foods, LLC*, 2018 WL 3945769, at *4 (N.J. Super. Ct. App. Div. Aug. 17, 2018). And that writing must contain "[a] provision that violates any clearly established legal right of a consumer or responsibility of a seller." N.J. Stat. Ann. § 56:12-15

Here, in all of its kitchen sink, Plaintiffs make no allegation that Defendants offered a sign or notice on notary fees that contained a provision that violates consumer rights. The CAC is silent on TCCWNA's writing requirement. Plaintiffs only offer what they paid for notary fees—nothing more. And their conclusory allegations that Defendants "caused to be offered and presented to [them] written notices and signs" violating their rights under N.J. Stat. Ann. § 22A:4-14 and the CFA, *see* CAC ¶¶ 291-92, are insufficient to state a claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("A formulaic recitation of the elements of a cause of action will not do[.]"). While Plaintiffs have annexed receipts for their notary purchases to the CAC, receipts memorializing a transaction are not contracts or notices under the TCCWNA. *Barile*, 2018 WL 3945769, at *4. At this juncture of the proceeding and having given Plaintiffs leeway enough, Plaintiffs have alleged only conclusions. Therefore, the Court dismisses Plaintiffs' TCCWNA claim without prejudice.

## C. Plaintiffs have plausibly stated an unjust enrichment claim.

Under New Jersey law, "[t]o establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994). This requires a plaintiff to show that: (1) plaintiff "expected remuneration from defendant at the time it performed or conferred a benefit on defendant[;]" and (2) the retention of that benefit without

payment would be unjust." *Woodlands Cmty. Ass'n, Inc. v. Mitchell*, 162 A.3d 306, 310 (N.J. Super. Ct. App. Div. 2017).

In New Jersey, unjust enrichment is not an "independent tort cause of action." *Castro v. NYT Television*, 851 A.2d 88, 98 (N.J. Super. Ct. App. Div. 2004). While New Jersey courts typically apply unjust enrichment as a basis for "quasi-contractual liability[,]" courts have noted an unjust enrichment claim "may arise outside the usual quasi-contractual setting." *Goldsmith*, 975 A.2d at 463 (citations and internal quotation marks omitted); *see also Cnty. of Essex v. First Union Nat. Bank*, 862 A.2d 1168, 1172 (N.J. Super. Ct. App. Div. 2004) (explaining "there are other circumstances in which courts find unjust enrichment applicable[,]" such as "when corrupt means have been employed to obtain a governmental contract, the concept of unjust enrichment has been used to deny the wrongdoer any profit from the transaction and to thereby deter such conduct"), *aff'd in part, rev'd in part on other grounds*, 891 A.2d 600 (N.J. 2006).

Here, Plaintiffs have plausibly alleged that Defendants have been unjustly enriched at their expense. While the parties engaged in a commercial transaction, the notary who provided notary services on Defendants' behalf is a public officer and exercises power derived from the State. *Villanueva*, 103 F.3d at 1137. Plaintiffs conferred an extra benefit to Defendants by paying them more for notary charges than N.J. Stat. Ann. § 22A:4-14 allows— a statute providing a public benefit by limiting the fee a notary can charge. *McLaren,* 2021 WL 3085151, at *5. Allowing Defendants to keep fees for a service performed by a public officer beyond what the law allows would be inequitable. *See id.* at *5 ("It is incomprehensible that the Legislature intended public officers, including notaries public, could simply charge

'and receive a fee' for certain services exceeding those fees set forth within the statutory framework.").

New Jersey courts have allowed unjust enrichment claims where a party overcharges for services beyond what the law allows. *Jenkins*, 148 A.2d at 34-35 (allowing unjust enrichment claim against defendant-landlord who overcharged plaintiff-tenant for rent in violation of rent control ordinance); *cf. Goldsmith*, 975 A.2d at 463 (finding plaintiff's unjust enrichment claim against, among others, municipality for overcharging fees for copying public records to be untimely, but recognizing that "unless plaintiff can prove that the fees defendants charged were 'excessive' in violation of the statute or common law, *thus bestowing an unjust benefit upon defendants*, he has no claim that defendants were unjustly enriched" (emphasis added)).   And other courts have allowed unjust enrichment claims against parties who overcharged for notary fees in violation of state law. *Jaraczewski*, 2024 WL 3861248, at *4-5; *Ortiz*, 2024 WL 3522036, at *5-8; *Seplow*, 717 F. Supp. 3d at 434-35.

Defendants' argument that Plaintiffs' unjust enrichment claim fails since they "did not perform or confer a benefit on any Defendant expecting remuneration" misconstrues New Jersey law on unjust enrichment.   [Defs.' Reply Mem. of Law in Supp. of Mot. to Dismiss 6 (Defs.' Reply Br.) (Docket No. 181).   As the New Jersey Superior Court, Appellate Division, explainted in *Matusow v. Izanec*, 2021 WL 3417934, at *23 (N.J. Super. Ct. App. Div. Aug. 5, 2021), "a party must show either the expectation of remuneration or the conferral of a benefit and, in either circumstance, 'that the retention of that benefit without payment would be unjust.'" Id. (citation omitted).   Because Plaintiffs have adequately pled the claim with the conferral of a benefit prong, this claim may proceed.

And it is too early to determine whether the voluntary payment rule bars Plaintiffs' unjust enrichment claim. "The common law voluntary payment rule provides that where a party, without mistake of fact, or fraud, duress or extortion, voluntarily pays money on a demand which is not [enforceable] against him, he cannot recover it back." *Prod. Source Int'l, LLC v. Foremost Signature Ins. Co.*, 234 F. Supp. 3d 619, 625 (D.N.J. 2017) (internal quotation marks omitted) (quoting *In re New Jersey State Bd. of Dentistry*, 423 A.2d 640, 643 (N.J. 1980)). The rule "only prevents restitution of payment if (1) the payment was made voluntarily, (2) the payor was not under any mistake of fact and (3) all circumstances of the payment were proper." *Simonson v. Hertz Corp.*, 2011 WL 1205584, at *3 (D.N.J. Mar. 28, 2011). Courts cannot dismiss a plaintiff's complaint at the motion to dismiss stage based on the voluntary payment rule "where the complaint does not establish whether the plaintiff's payment was truly voluntary and made without mistake of fact." *Rickenbach v. Wells Fargo Bank, N.A.*, 635 F. Supp. 2d 389, 395 (D.N.J. 2009).

The CAC does not establish whether Plaintiffs' payments to Defendants were truly voluntary or without mistake of fact. *Id.* For example, there's no allegation that Plaintiffs knew that the notary fees Defendants charged violated N.J. Stat. Ann. § 22A:4-14 and Plaintiffs paid the fees anyway. *See City of Camden v. Green*, 25 A. 357, 358 (N.J. 1892) (finding voluntary payment rule barred recovery where plaintiff paid $500 to municipality for liquor license knowing the city board had lowered the fee to $300). And Plaintiffs have alleged that Defendants acted improperly since they overcharged for notary fees and tacked on convenience fees even though Defendants only provided notary services. [CAC ¶¶ 253-56, 264-66.] So the Court cannot tell from the CAC if "all circumstances of the payment were

proper." *Simonson*, 2011 WL 1205584, at *3. The Court, therefore, denies Defendants'

motion to dismiss Plaintiffs' unjust enrichment claim.

### D. Plaintiffs have plausibly alleged that TUPSS is vicariously liable for its franchisees' conduct.

Generally, a party is not liable for another's conduct, but sometimes, the law imposes

liability if the parties share a principal-agent relationship. *See generally Am. Tel. & Tel. Co. v.

Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1434-36 (3d Cir. 1994). To hold a

franchisor—like TUPSS—liable for the conduct of its franchisee—such as RKSP and

JB&A—courts must find that the franchisor and franchisee have a principal-agent

relationship. *eTeam*, 2017 WL 2539395, at *2. And "[t]o claim a defendant is vicariously

liable, a plaintiff must allege facts sufficient to make it plausible the primary wrongdoer was

the defendant's agent." *Migliore*, ___ F.4th at ___, 2025 WL 2970755, at *4.

"An agency relationship is created when one party consents to have another act on its

behalf, with the principal controlling and directing the acts of the agent." *Id.* (quoting

*Covington v. Int'l Ass'n of Approved Basketball Offs.*, 710 F.3d 114, 120 (3d Cir. 2013)). The

principal's right to control the agent's conduct is "[a] necessary element" to finding an agency

relationship. *Kernan v. One Washington Park Urb. Renewal Assocs.*, 713 A.2d 411, 419 (N.J.

1998) (citation and internal quotation marks omitted); *accord Drexel v. Union Prescription

Centers, Inc.*, 582 F.2d 781, 785 (3d Cir. 1978) (applying Pennsylvania law). "[D]irect control

of principal over agent is not absolutely necessary; a court must examine the totality of the

circumstances to determine whether an agency relationship existed even though the principal

did not have direct control over the agent." *Sears Mortg. Corp. v. Rose*, 634 A.2d 74, 80

(N.J.1993); *accord Drexel*, 582 F.2d at 785 ("Actual control of the manner of work is not essential; rather, it is the right to control which is determinative.").

It is hard to apply traditional agency principles to the franchisor-franchisee relationship because "some degree of control by the franchisor" is inherent in that relationship. *Drexel*, 582 F.2d at 785-86. "[T]he mere existence of a franchise relationship does not necessarily trigger a master-servant relationship, nor does it automatically insulate the parties from such a relationship." *Id.* at 786. So, to determine whether a franchisor has an agency relationship with its franchisee for vicarious liability to attach, courts look to whether the franchisor has the right to control "the day-to-day operations of the franchise." *Michalak v. ServPro Indus., Inc.*, 2019 WL 3562690, at *4 (D.N.J. Aug. 6, 2019) (emphasis removed). Whether a franchisor has the required right to control its franchisee "to establish an agency relationship depends entirely on the facts of each individual case, including the extent of the control as defined by the franchise agreement, and the actual practice of the parties." *eTeam*, 2017 WL 2539395, at *3. That the franchisor and franchisee explicitly disclaim an agency relationship in the franchise agreement "is not in itself determinative of the matter." *Drexel*, 582 F.2d at 786.

Viewing the facts in Plaintiffs' favor and giving them the benefit of all reasonable inferences, Plaintiffs have plausibly alleged that TUPSS has the right to control the day-to-day operations of its franchisees on notary transactions and pricing. Plaintiffs have alleged more direct involvement by TUPSS with its franchisees than the typical franchisor-franchisee relationship. For starters, TUPSS contractually mandates that each franchisee employ a notary and offer notary services. [CAC ¶¶ 72-73, 78, 84.] TUPSS imposes staffing requirements requiring each franchisee-store to have a notary on-duty during store hours. [*Id.*

26

¶¶ 72-73.]    TUPSS mandates the hours that notaries must be available in the franchisee's store to provide notary services.  [*Id.*]  TUPSS also requires its franchisees to use "required network-wide [point-of-sale] system" equipped with "uniform TUPSS-created-and-approved SKU codes[,]" which enables TUPSS to track every single notary transaction a franchisee makes, how much the franchisee charged, and how much money the franchisee took in.  [*Id.* ¶¶ 99-100.]  Additionally, TUPSS strictly controls the marketing for notary services, requiring each franchisee to use TUPSS' approved advertisements.  [*Id.* ¶¶ 141-43.]  And TUPSS takes a five percent cut of all store-generated revenue, which includes revenue from notary services.  [*Id.* ¶ 56.]

TUPSS also provides mandatory training on conducting notary transactions and provides instruction on pricing for the notary services.  [*Id.* ¶¶ 205-06.]  TUPSS issues bulletins to its franchisees recommending that its franchisees hit certain profit margins, and provides instructions on how to do so.  [*Id.* ¶¶ 234-35.]    Courts have found that a franchisor's manuals and policies that outline specific policies and procedures that franchisees must follow—like the manuals, bulletins, and training materials that TUPSS provides to its franchisees—may show that the franchisor exercises day-to-day control over its franchisee to trigger vicarious liability.  *See Michalak*, 2019 WL 3562690, at *4; *see also eTeam*, 2017 WL 2539395, at *3.

What's more, Plaintiffs have alleged enough facts to infer that TUPSS has the right to control its franchisees' notary pricing.  For instance, TUPSS mandates its franchisees offer notary services and to comply with state-laws that cap fees for notary services.  [CAC ¶¶ 84, 242.]  By telling its franchisees to comply with those state-laws, TUPSS, in essence, imposes restrictions on how much its franchisees can charge for notary fees (at least in states that have laws imposing limits on notary fees).    And when a franchisee overcharges for notary fees in

violation of state-law, TUPSS addresses the overcharges directly by refunding customers who have been overcharged, and/or telling the franchisees about the state-law cap, which resulted in the franchisee issuing a refund.  [*Id.* ¶¶ 185-87, 191-92, 194-95.]  Thus, TUPSS can override its franchisees' pricing decisions, which suggests day-to-day control.  *Cf. Michalak*, 2019 WL 3562690, at *2, *4-5 (finding plaintiffs plausibly alleged agency relationship between franchisor and franchisee where, among other things, franchisor told plaintiff complaining about sexual harassment at the franchisee "a full investigation would be performed").

To sum up, TUPSS' mandates on requiring notary services, its requirements on notary staffing and shift-work, its strict restrictions on advertising for notary services, its extensive and mandatory training on notary services, and its direct customer involvement with notary fee overcharges, coupled with the fact that TUPSS collects revenue from its franchisees from notary services, support an inference that TUPSS has the right to control the day-to-day operations of its franchisees' notary services.  *See Drexel*, 582 F.2d at 790 (finding summary judgment for franchisor on vicarious liability improper, reasoning franchise agreement's provisions revealed that franchisor "reserved the right to control numerous specific facets of the franchisee's business operation, ranging from the appearance and contents of the store, its advertising and promotional programs, and its accounting, inventory, and record-keeping systems, to the minimum number of weekly operating hours, the type of prescription labels and files, personnel uniforms, and the color of delivery trucks"); *see also Doe (C.J.) v. Cotugno*, 2024 WL 4500994, at *5 (D.N.J. May 16, 2024) (holding plaintiff plausibly alleged vicarious liability where franchisor "shared profits [with franchisee], standardized employee training and rules of operations, controlled pricing and reservations, regularly conducted inspections,

28

provided operational support, and had the right to terminate any franchisee, . . . , that failed to comply with [franchisor's] requirements").

The caselaw that TUPSS relies on to show it is not vicariously liable is different. [Defs.' Br. at 11-15.] For starters, whether an agency relationship exists between a franchisor and franchisee is a fact-driven inquiry that turns on the parties' franchise agreement and actual conduct, which will vary from case-to-case. *eTeam*, 2017 WL 2539395, at *3. So "cases with differing factual circumstances have little bearing on [the court's] analysis." *Id.* at *4. That aside, in the cases that TUPSS relies on, the franchisor lacked the right to control "over the instrumentality at issue[.]" *Id.*

For instance, in *J.M.L. ex rel. T.G. v. A.M.P.*, New Jersey's Appellate Division found a franchisor lacked the required day-to-day control over its franchisee to hold a franchisor liable for sexual harassment where, among other things, the franchisor "provided little or no guidance on the day-to-day operations of the franchises[,]" had no role in personnel decisions, and did not require franchisees to "use [the franchisor's] pre-packaged marketing plan or contribute to a marketing plan[.]" A.2d 291, 297-98 (N.J. Super. Ct. App. Div. 2005). And, in *Boutahli*, the Court found a franchisor could not be found liable on agency principles for injuries a franchisee-employee suffered during a robbery at the franchisee's store. 2020 WL 3287127, at *2, *6. In doing so, the Court looked to the franchise agreement and concluded the franchisor had "a clearly defined [] limited role when it comes to how the store operates each day." *Id.* The *Boutahli* court also looked to the parties' conduct and noted that while the franchisor sent business consultants to provide recommendations to its franchisees, the franchisees had no obligation to follow them. *Id.* Thus, the Court found the required right to control the day-to-day operations lacking. *Id.*

*J.M.L.* and *Boutahli* illustrate the unremarkable proposition that whether a franchisor has the right to control the day-to-day operations of its franchisees will turn on the franchise agreement and the parties' conduct. At this pleading stage TUPSS cannot use those cases to avoid Plaintiffs' allegations supporting vicarious liability at this stage.

Plaintiffs only need to plausibly allege that RKSP and JB&A are TUPSS' agents, *Migliore*, ___ F.4th at ___, 2025 WL 2970755, at *4, and that TUPSS has the right to control the day-to-day operations of its franchisees, *Michalak*, 2019 WL 3562690, at *4.   As stated, Plaintiffs offer enough allegations to draw a reasonable inference of agency and the right to control to avoid dismissal.   *See Martinez v. UPMC Susquehanna*, 986 F.3d 261, 265 (3d Cir. 2021) (explaining "plausible does not mean probable" and "[t]he court need only be able to draw a 'reasonable inference' that the defendant has broken the law" (citation omitted)).   So the Court denies TUPSS' motion to dismiss based on vicarious liability grounds.

### E.  Plaintiffs have plausibly alleged a civil conspiracy claim.

"In New Jersey, a civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005) (citation and internal quotation marks omitted).   To prevail on a civil conspiracy claim, Plaintiffs must show:  "(1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; and (4) proof of special damages." *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 (3d Cir. 2003).

"The gist of [a civil conspiracy] claim is not the unlawful agreement, 'but the underlying wrong which, absent the conspiracy, would give a right of action.'" *Morgan v. Union Cnty. Bd. of Chosen Freeholders*, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993) (quoting *Board of Education v. Hoek,* 183 A.2d 633, 646 (N.J. 1962)). "It is enough [for liability] if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Banco*, 876 A.2d at 263 (alteration in original) (quoting *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir.1988)).

Here, as alleged, TUPSS, RKSP, JB&A, and TUPSS' other New Jersey franchisees are a combination of two or more persons. *Morganroth & Morganroth*, 331 F.3d at 414. Plaintiffs allege that the conspiracy's purpose was to increase Defendants' revenues from overcharging notary fees in violation of New Jersey law. [CAC ¶¶ 172, 306.] So Plaintiffs have alleged "a lawful purpose to be achieved by unlawful means." *Morganroth & Morganroth*, 331 F.3d at 414. Overcharging for notary fees is an overt act needed to show a civil conspiracy. *Banco*, 876 A.2d at 263. As the Court found earlier, Plaintiffs have plausibly alleged a CFA claim, and as such, there's an underlying wrong to support a conspiracy claim. And Plaintiffs have alleged damages because they paid more for notary services than the law allows. [CAC ¶¶ 172, 306.] But whether Plaintiffs have plausibly alleged a conspiratorial agreement is a much closer call.

New Jersey courts recognize that "the nature of a conspiracy is such that more often than not the only type of evidence available is circumstantial in nature" and "it is unlikely that direct evidence of an unlawful agreement will exist." *Morgan*, 633 A.2d 998 (citations and internal quotation marks omitted). So "whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer

from the circumstances [that the alleged conspirators] had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objective." *Id.* (alterations in original, citation and internal quotation marks omitted).

Plaintiffs have alleged facts to infer an agreement between TUPSS and its franchisees to overcharge for notary fees. As noted earlier, TUPSS knows or should know that N.J. Stat. Ann. § 22A:4-14 sets the maximum amount notaries can charge for notary services. Indeed, TUPSS has instructed franchisees to comply with state laws that regulate "the maximum amount [franchisees] may charge for notary services." [CAC ¶ 84; *see also id.* ¶ 242.] TUPSS extensively monitors its New Jersey franchisees' notary transactions. [*Id.* ¶¶ 99-100.] TUPSS maintains records showing how much each New Jersey franchisee charges for notary transactions, and in many cases, those records reveal that TUPSS' franchisees are charging more for notary services than N.J. Stat. Ann. § 22A:4-14 allows. [*Id.* ¶¶ 115-24.] Viewing those allegations in Plaintiffs' favor and giving them the benefit of all reasonable inferences, TUPSS knows or should know its TUPSS' franchisees are violating N.J. Stat. Ann. § 22A:4-14.

What's more, in other States, TUPSS has expressly advised franchisees to comply with state-laws regulating the maximum amount notaries can charge. [*Id.* ¶¶ 187, 191-95.] Plaintiffs have alleged that while one franchisee offered a one-time refund for overcharging a customer, that franchisee told TUPSS that it would continue to overcharge notary fees by tacking on a "clerical fee[.]" [*Id.* ¶ 191 n. 134.] That same franchisee continued to overcharge consumers for notary fees in violation of state law. [*Id.* ¶¶ 192-93.] Plaintiffs allege that TUPSS' New Jersey franchisees similarly overcharge for notary services, and TUPSS has not

exercised its contractual rights under the Franchise Agreement to terminate those franchisees. [*Id.* ¶¶ 91-96, 197, 250.]

Plaintiffs' allegations support a reasonable inference that TUPSS knows its New Jersey's franchisees are breaking the law by overcharging for notary services, has acquiesced in that conduct by not terminating those franchisees for violating the law, and accepts the benefit from the overcharges by taking a percentage of its franchisees' store-generated revenues from notary fees. Again, as the New Jersey Supreme Court explained, civil conspiracy liability may attach when one "understand[s] the general objectives of the scheme, accept[s] them, and agree[s], either explicitly or implicitly, to do [one's] part to further them." *Banco*, 876 A.2d at 263 (citation and internal quotation marks omitted). At the pleading stage, Plaintiffs have met that standard, and so, the Court denies TUPSS' motion to dismiss Plaintiffs' civil conspiracy claim.

**F. The Court construes Plaintiffs' Declaratory Judgment Act Claim as a Remedy.**

The Federal Declaratory Judgment Act, 28 U.S.C. § 2201, "is not a standalone source of rights, but a procedural vehicle for litigants to seek a declaration of their rights under some other law." *MedWell, LLC v. Cigna Corp.*, 2021 WL 2010582, at *2 (D.N.J. May 19, 2021); *see also Kabbaj v. Google Inc.*, 592 F. App'x 74, 75 n.2 (3d Cir. 2015) (explaining declaratory relief is a remedy and not a cause of action). While some courts dismiss Declaratory Judgment Act claims when pled as an independent cause of action, *MedWell,* 2021 WL 2010582, at *2, this Court will construe Plaintiffs' Declaratory Judgment Act claim as a remedy rather than a standalone claim. *See Tripicchio*, 2023 WL 3182915, at *6; *see also Hobson v. Hartford Ins. Co. of the Midwest*, 2022 WL 4536470, at *6 (D.N.J. Sept. 28, 2022) (dismissing claim for

declaratory judgment framed "as a standalone claim," but allowing plaintiff "to seek a declaratory judgment as a remedy in connection with one or more of its substantive claims").

### G. The Court will not strike the CAC's Class Allegations.

Courts disfavor striking class allegations from a pleading at the motion to dismiss stage "because a motion for class certification is a more appropriate vehicle for arguments about class propriety." *Gray v. BMW of N. Am., LLC*, 22 F. Supp. 3d 373, 386 (D.N.J. 2014); *see also In re Allergan Biocell Textured Breast Implant Prods. Liab. Litig.*, 537 F. Supp. 3d 679, 752 (D.N.J. 2021) ("[I]n this District, dismissal of class allegations at [the pleading] stage should be done rarely and that the better course is to deny such motion because the shape and form of a class action evolves only through the process of discovery." (alteration in original, citation and internal quotation marks omitted)). Striking class allegations at the pleading stage is reserved for "those rare cases where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met." *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 205 n.3 (D.N.J. 2003).

Although Defendants raise legitimate points that call certification of a class into question, the Court will deny Defendants' motion to strike the class allegations as premature. *See, e.g.*, *Gujral v. BMW of N. Am., LLC*, 2022 WL 3646627, at *3 (D.N.J. Aug. 23, 2022) (denying motion to strike class allegations at the pleading stage, recognizing that "Courts throughout the Third Circuit have routinely declined to hear premature arguments regarding class certification in similar circumstances"). Indeed, "[c]lass determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action, and discovery is therefore integral." *Gray*, 22 F. Supp. 3d at 386. Having reviewed the CAC, this Court cannot say that the pleading "itself" shows Plaintiffs

cannot satisfy Rule 23 class action requirements.    *Clark*, 213 F.R.D. at 205 n.3.    Defendants

may renew their arguments at the class certification stage.

### III. CONCLUSION

For the above reasons, the Court **GRANTS**, **in part**, and **DENIES**, **in part**,

Defendants' motion to dismiss, and denies Defendants' motion to strike the class allegations

(Docket No. 173).  An accompanying Order of today's date shall issue.

<u>s/Renée Marie Bumb</u>
RENÉE MARIE BUMB
Chief United States District Judge

Dated: November 20, 2025